Filed 4/19/13  P. v. Cole CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>STEIN HEATH COLE,<br><br>    Defendant and Appellant. | F062418<br><br>(Super. Ct. No. 09CM1889)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Donna L. Tarter, Judge.

Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Paul A. Bernardino, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant Stein Heath Cole maintains the following:  (1) the trial court erred when it allowed prior bad acts evidence as the evidence was irrelevant and prohibited by Evidence Code sections 352 and 1101, subdivision (b); (2) he was deprived of his state

and federal due process rights, as well as his right to a reliable verdict, because the great bodily injury enhancement pursuant to Penal Code[1] section 12022.7 was imposed in the absence of substantial evidence; (3) the evidence was insufficient to prove attempted dissuasion of a witness; and (4) the trial court erred when it imposed consecutive terms on counts 9 through 12 as those terms are prohibited by section 654. We affirm the judgment.

## PROCEDURAL BACKGROUND

In an information filed August 4, 2009, appellant was charged with corporal injury to his spouse, Kim Cole[2] (§ 273.5, subd. (a); count 1), forcibly resisting arrest (§ 69; counts 2 & 15), criminal threats (§ 422; counts 3 & 14), unauthorized cultivation of marijuana (Health & Saf. Code, § 11358; count 4), possession of marijuana for sale (Health & Saf. Code, § 11359; count 5), being a felon in possession of a firearm (§ 12021, subd. (a)(1); count 6), possession of an assault weapon (§ 12280, subd. (b); count 7), attempting to dissuade a witness (§ 136.1, subd. (a)(2); counts 8-12), resisting arrest (§ 148; counts 13 & 17), and possession of dangerous fireworks (Health & Saf. Code, § 12677; count 16). It was further alleged that appellant personally inflicted great bodily injury in circumstances involving domestic violence in violation of section 12022.7, subdivision (e).

Before trial, appellant pled no contest to misdemeanor possession of dangerous fireworks, and the People dismissed the possession of an assault weapon charged in count 7.

Following jury trial, appellant was convicted of all remaining counts and the enhancement was found true. He was sentenced to a total of 13 years 8 months in state prison.

---

[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

[2]Appellant's wife will be referred to by her first name only. No disrespect is intended.

# FACTUAL BACKGROUND

On December 11, 2008, at about 10:30 a.m. dispatcher Martha Augustus received a 911 call originating from appellant's residence. The call was an open line; no one spoke directly with the dispatcher but the dispatcher could hear a male and a female arguing in the background. Law enforcement personnel were dispatched to the scene.

Officer Alex Chavarria arrived first. He approached the front door of the home and could hear a male shouting and a female crying inside the home. The officer knew appellant and his wife lived in the home. After another officer arrived to assist, Chavarria knocked on the front door, yet received no response. Chavarria radioed for the assistance of his supervisor, Sergeant Jason Bietz. Once Bietz arrived on scene and was briefed by Chavarria, the two men approached the front of the home. Both the interior door and the security screen door were closed.

After appellant opened the interior door only, the officers advised him they were there to make a welfare check of the female occupant. Appellant replied that he and his wife had had a verbal disagreement but that she was fine. Appellant refused to exit the home and closed the interior door, never having opened the security screen door. He did not respond to a repeated request for entry. Chavarria retrieved a pry bar from his patrol vehicle and Bietz began to apply force to the door with the pry bar. Appellant was heard making threats to shoot if the officers persisted. Fearing for their safety, the officers retreated. Eventually, appellant exited the house and surrendered.

Bietz made contact with Kim and her three-year-old son. Kim had injuries to her face. Those injuries included lumps and swelling on her forehead, a fresh abrasion to the bridge of her nose, and blood present in her left eye. A protective sweep of the home revealed no other persons were present. During that sweep, Bietz and Chavarria noticed a number of marijuana plants in various stages of growth. Bietz contacted the Kings County Narcotics Task Force.

A search warrant was obtained and a more thorough search was conducted. The search revealed that appellant used his home to grow marijuana. Processed marijuana and several firearms were found in two storage sheds located on the property.

Senior Criminalist Steven Patton with the California Department of Justice analyzed the material confiscated from appellant's home. Random sampling and subsequent analysis confirmed the green leafy material was marijuana. Patton tested 8.31 pounds of the material submitted.

While awaiting trial, appellant made several telephone calls from the jail to his home between December 18 and December 26, 2008. Those calls were recorded and Bietz heard dozens of the recordings. In the recordings, appellant can be heard telling Kim not to go to court and to avoid being served with a subpoena. At one point, appellant tells Kim she may have to leave town to avoid service. In another call, appellant asks Kim to visit him at the jail so that the two can get their story straight; appellant tells Kim that a woman named Priscilla caused her injuries. Finally, in another call, appellant tells Kim that if she were to die, her statements to law enforcement could be used against him in her absence. The recordings were played for the jury.

*Defense Case*

Appellant testified that he lives two lives: growing marijuana and being a family man. As a result of living these two lives, he does not sleep much.

On December 11, 2008, he had been sleeping when he was awakened by a loud sound, like a door slamming. Kim called out to him and had her hand over her eye. When Kim pulled her hand away from her face, appellant noticed redness. She was yelling and screaming. Appellant went past Kim and opened the door and security screen. Looking out into the yard, he noticed a woman that he had been having an affair with run into his neighbor's yard.

When appellant closed the door to the house, he and Kim began arguing about Priscilla, the woman with whom he had the affair. His three-year-old son called 911. The arguing and screaming that could be heard by the dispatcher during the calls

4.

involved accusations from Kim as well as the two throwing water and soda at one another. After the two calmed down, appellant got an ice pack for Kim and, while doing so, he heard a knock at the door. Once he realized there were officers at his door, appellant panicked. Because he'd had a recent incident with his neighbors, he assumed the officers' presence was the result of a set up.

Eventually he went to the door and advised Bietz that there was no problem and that the officers could leave. Instead, Bietz pointed his weapon at appellant and threatened to blow his head off if he did not open the door. Appellant replied, "Not today you're not," and slammed the door.

Appellant called 911 because he was afraid for his life. He did not have a shotgun and was bluffing when he said he would shoot the officers. After calling his attorney, appellant ultimately exited the house. However, once he was outside, officers placed a sawed-off chrome shotgun to his head before handcuffing him and placing him in a patrol car.

Because the weapons located in a shed on his property belonged to his father, appellant did not believe he was in possession of any firearms. He grew marijuana for medicinal purposes, and he had medical cards permitting him to do so. Appellant used marijuana to treat his chronic pain. He also grew it to assist other individuals who had medical marijuana cards—there were a total of seven such cards or recommendations in his home. Appellant denied selling marijuana; he did, however, donate it to co-ops like the Compassionate Cannabis Information Center in Goshen. Further, appellant believed he never exceeded the limit that he was permitted to possess pursuant to the various recommendations in his possession and that the amount he possessed was for personal use.

Appellant was aware phone calls were recorded in the Kings County jail. He used the telephone in the pod several times and taunted law enforcement officers during those calls because he believed he had been set up. When questioned specifically on cross-examination about a number of the telephone calls, appellant denied telling Kim not to

5.

come to court or to avoid a subpoena. He explained he was trying to let her know that if she did not come to court to tell the truth about Priscilla striking her, he would be "screwed." Appellant denied collaborating with Kim about a story they would tell in court. He was only "refreshing" her memory about what had happened. Further, Kim was worried that if she did show up in court, her son would be taken by child protective services. This is so, appellant explained, because Kim had been threatened by law enforcement officials that if she did not make a statement against him about this incident, her son would be taken from her.

## DISCUSSION

### I.      Admission of the Prior Bad Acts Evidence

Appellant contends the admission of prior bad acts evidence was irrelevant and prohibited by Evidence Code sections 352 and 1101, subdivision (b). This contention pertains to the criminal threats alleged in counts 3 and 14 involving Bietz and Chavarria. He argues reversible error in the admission of two prior bad acts: (1) that Chavarria was aware appellant had been previously involved in a hostage situation and, (2) that appellant's neighbors had recently reported his having threatened them with a gun.

*Relevance*

"'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Evidence Code section 351 states that "[e]xcept as otherwise provided by statute, all relevant evidence is admissible."

Here, the evidence in question is appellant's purported prior involvement in a hostage situation and his more recent involvement in a threat to his neighbors involving a gun. The evidence was offered to establish an element of the crime of criminal threat, to wit: whether the person threatened was reasonably in sustained fear for his or her own safety. (§ 422.) Appellant had threatened to shoot when law enforcement attempted to enter his home after he refused to comply with their requests for entry. Appellant

6.

admitted making the statement, yet claimed he was bluffing. Whether Chavarria and Bietz were reasonably in sustained fear for their own safety is evidence that would tend to prove or disprove a disputed fact of consequence to the determination of the action, and thus, the evidence is relevant.

### A. Evidence Code section 1101, subdivision (b)

"(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." (Evid. Code, § 1101.)

"Subdivision (a) of section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.)

The trial court's ruling under either Evidence Code section 1101 or Evidence Code section 352 is reviewed on appeal for abuse of discretion. (*People v. Homick* (2012) 55 Cal.4th 816, 865; *People v. Lenart* (2004) 32 Cal.4th 1107, 1123; *People v. Kipp* (1998) 18 Cal.4th 349, 369, 371.)

Evidence of crimes not charged in the present proceeding, though sometimes admissible for the purposes set forth in Evidence Code section 1101, subdivision (b), must be handled with care:

"It is … well settled that evidence may be admitted, even though it embraces evidence of the commission of another crime, if it logically tends to prove a material element in the People's case. [Citations.] However, 'It has frequently been recognized … that because of the sound reasons behind the general rule of exclusion, the relevancy of evidence of other crimes, and therefore its admissibility, must be examined with care. [Citation.] The evidence should be received with "extreme caution," and if its connection with the crime charged is not clearly perceived, the doubt should be resolved in favor of the accused. [Citations.]'" (*People v. Guerrero* (1976) 16 Cal.3d 719, 724.)

Even when evidence is relevant under Evidence Code section 1101, subdivision (b), it must be excluded under Evidence Code section 352 if its prejudicial effect substantially outweighs its probative value:

"Our conclusion that section 1101 does not require exclusion of the evidence of defendant's uncharged misconduct, because that evidence is relevant to prove a relevant fact other than defendant's criminal disposition, does not end our inquiry. Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' [Citation.] [¶] … We thus proceed to examine whether the probative value of the evidence of defendant's uncharged offenses is 'substantially outweighed by the probability that its admission [would] … create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 404.)

In applying these principles to this matter, we conclude that the trial court acted within its discretion in admitting the uncharged offense evidence to show the state of mind of the victims, Chavarria and Bietz.

Specifically, Chavarria testified outside the presence of the jury that he was aware at the time of this incident that appellant had been in prison for a hostage situation and, further, that appellant's neighbors had recently reported that he had threatened them with a gun. Defense counsel objected, indicating appellant did not go to prison for a hostage situation and that a confidential informant had indicated appellant had pointed a gun at him, according to discovery provided. Because the confidential informant could not be cross-examined and because the evidence was "totally tenuous," counsel argued against

8.

its admission.  The prosecutor explained that the information was not being offered for the truth of the matter asserted; rather, it was offered to show the officers' state of mind that it was reasonable to believe appellant was capable of shooting at officers, had access to firearms, and had been previously involved in a "hostile situation."  After arguing to the court that the evidence was improper and speculative, defense counsel expressly objected to the evidence for a lack of foundation, its prejudicial effect, and lastly, on the basis of hearsay.

The trial court explained its ruling as follows:

> "THE COURT:  All right, the testimony that is proposed—that has been proffered is to demonstrate fear, sustained fear that Officer Chavarria was experiencing on that day, that is an element of the offense and therefore his state of mind is relevant even though the statement is—lacks foundation and it is hearsay.  The Court will give a limiting instruction to the jury stating that they can consider what Mr. Chavarria's belief is, but they cannot consider his testimony for the truth of the matter.  In other words, he is going to testify that he thought that … he had information that neighbors were complaining about [appellant] walking around with a gun.

> "[DEFENSE COUNSEL]:  Threatening him with a gun is what he said, I think that is what he said.

> "THE COURT: Threatening him with a gun.  That is hearsay, however it is relevant.  The statement and also the 352 objection will be overruled as to that particular statement.  Certainly it is prejudicial, but [its] probative value substantially outweighs prejudicial effect."

After clarification that appellant had not been "convicted of a hostage situation,"[3] defense counsel objected that the information was totally unreliable and highly prejudicial.  The trial court indicated the statements would be admitted along with a limiting instruction.

Officer Chavarria testified that he believed appellant had "an arrest regarding an incident … where he was involved in a hostage situation" and that weeks prior to this incident, appellant's neighbors complained he was threatening them with a gun.  After

---

[3]Instead, appellant had apparently been found guilty of child endangerment in violation of section 273a, subdivision (a), and false bomb threats in violation of section 148.1, subdivision (d) following an investigation into a hostage-type situation.

overruling defense counsel's objections, the trial court read the limiting instruction to the jury. It is presumed the jury followed the court's instructions. (*People v. Homick*, *supra*, 55 Cal.4th at p. 867; *People v. Delgado* (1993) 5 Cal.4th 312, 331.)

Section 422 "incorporates a mental element on the part of not only the defendant but the victim as well. In order to establish a section 422 violation, the prosecution must establish … that the victim was in a state of 'sustained fear.' The prosecution must additionally show that the nature of the threat, both on 'its face and under the circumstances in which it is made,' was such as to convey to the victim an immediate prospect of execution of the threat and to render the victim's fear reasonable." (*People v. Garrett* (1994) 30 Cal.App.4th 962, 966-967.)

In this case, appellant's statements that if officers broke down his door he would shoot were heard by Bietz and Chavarria. Both testified the statements caused them fear, both retreated to safety for cover, and both remained concerned until appellant surrendered. The evidence was properly admitted to establish the mental element required of the victims pursuant to section 422. (*People v. Garrett*, *supra*, 30 Cal.App.4th at p. 967 ["Seldom will evidence of a defendant's prior criminal conduct be ruled inadmissible when it is the primary basis for establishing a crucial element of the charged crime"].)

Despite appellant's argument to the contrary, the prior uncharged offense evidence was not offered as evidence of his intent. Rather, the evidence was offered to prove the officers' sustained fear in light of appellant's threats to shoot them if they persisted in attempting to enter his home.

We disagree with appellant's argument that the prior uncharged evidence was too dissimilar to have had a bearing on the officers' state of mind. Instead, we find sufficient similarity between the hostage-type situation, the brandishing a weapon incident, and this incident—where appellant refused to allow officers to speak with his wife, refused their requests for entry, and threatened to shoot the officers if they entered his home.

In sum, this evidence was admissible and it was not offered to prove appellant's character, disposition, or intent.

### B.       Evidence Code section 352

Having concluded that the uncharged offense evidence was admissible to prove the officers' sustained fear following appellant's threat, we turn to whether the evidence should have been excluded under Evidence Code section 352.

A court may exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)  A trial court retains the discretion to admit or exclude evidence under Evidence Code section 352.  The exercise of that discretion will not be disturbed on appeal absent a showing that the trial court exercised its discretion in an arbitrary, capricious or patently absurd manner.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9.)

The probative value of the evidence in question was significant.  If believed, the prosecution's burden to meet an element of the criminal threat crimes alleged was met— that appellant's threats to shoot the officers trying to enter his home caused those officers to operate in a state of sustained fear.  Prior to admitting the prior acts evidence, the trial court carefully evaluated the evidence pursuant to Evidence Code section 352.  Chavarria was then permitted to testify about the acts of which he had knowledge at the time the threats were made.  The trial court expressly acknowledged that the uncharged offense evidence was in fact prejudicial, but determined its probative value on the issue of the officers' fear substantially outweighed the prejudicial effect.  The trial court's determination was not arbitrary or capricious, nor was it patently absurd.  Appellant's contention is rejected.

Appellant also claims the prosecutor used the prior uncharged evidence as "part of the central theme of his case, and mainly to rebut appellant's denial of culpability."  Our review of the record reveals otherwise.

It is plain from the closing argument that the prosecutor relied upon all of the evidence, including the recordings of the 911 calls and the calls from the jail, the photographs, and all testimony given to rebut appellant's version of the events. The prosecutor referenced the prior uncharged evidence briefly while explaining to the jury how the People had met their burden of establishing the fifth element of making a criminal threat—that Chavarria and Bietz were in sustained fear for their safety. The prosecutor's closing argument lasted approximately an hour and a half. It encompasses 36 pages of the reporter's transcript. Yet the prosecutor's reference to the prior uncharged evidence amounts to only two paragraphs in about a single page of that portion of the transcript. Thus, we disagree the prosecutor's reference amounted to the "central theme of his case" and reject appellant's contention.

## II.     There Was Substantial Evidence of Great Bodily Injury

Appellant challenges the sufficiency of the evidence to prove he inflicted great bodily injury pursuant to section 12022.7 and argues his constitutional rights to due process and a reliable verdict have been violated. We disagree.

In assessing a claim of insufficiency of the evidence, the reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. It is the jury that must be convinced of a defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 11; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

In reviewing a challenge to the sufficiency of the evidence, appellate courts do not determine the facts. We examine the record as a whole in the light most favorable to the

12.

judgment and presume the existence of every fact the trier of fact could reasonably deduce from the evidence in support of the judgment. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) If the verdict is supported by substantial evidence, a reviewing court must accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of the fact finder. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The testimony of a single witness—unless physically impossible or inherently improbable—is sufficient for a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

An appellate court must accept logical inferences that the jury might have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Before the judgment of the trial court can be set aside for insufficiency of the evidence, "it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429; see *People v. Conners* (2008) 168 Cal.App.4th 443, 453.)

Once the jury found appellant had violated section 273.5, subdivision (a)—corporal injury of a spouse—it was next required to determine whether appellant inflicted great bodily injury in the commission of that offense. Great bodily injury "means a significant or substantial physical injury." (§ 12022.7, subd. (f); see § 12022.8; *People v. Escobar* (1992) 3 Cal.4th 740, 749-750.) The California Supreme Court has long held this is a factual, not a legal determination. (*People v. Escobar*, *supra*, at p. 750; *People v. Wolcott* (1983) 34 Cal.3d 92, 109.) "'A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description.'" (*Escobar*, *supra*, at p. 752, quoting *People v. Jaramillo* (1979) 98 Cal.App.3d 830, 836; *People v. Clay* (1984) 153 Cal.App.3d 433, 460.) Where to draw that line is for the jury to decide.

Subdivision (e) of section 12022.7 provides as follows:

"Any person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission of a felony or attempted felony shall be punished by an additional and consecutive

13.

term of imprisonment in the state prison for three, four, or five years. As used in this subdivision, 'domestic violence' has the meaning provided in subdivision (b) of Section 13700."

Because the victim of appellant's crime, his wife Kim, did not testify, evidence regarding her injuries was primarily admitted through the testimony of Sergeant Bietz and the photographs taken of Kim's face on the date of the incident. Bietz testified that upon contacting Kim he noticed several fresh injuries to her face. Two of those injuries were lumps that increased in size and began to darken several minutes after Bietz's initial contact with Kim. She also had a slight, bright red, abrasion on the bridge of her nose, and what Bietz believed was a broken blood vessel in her left eye, "evident by a large amount of blood in the eye." Bietz identified the photographs taken of Kim that depicted her injuries. With particular regard to the eye injury, Bietz identified blood visible in Kim's left eye in People's exhibit Nos. 15 and 16. The photographs were admitted without objection. Notably, too, the jury listened to the recorded 911 calls received from appellant's residence; a female can be heard screaming in the background.

During closing argument, the prosecutor stated the following:

"In this case we charged in addition to [section 273.5,] we have also charged great bodily injury. And once again you as the triers of fact, you are now the judges, you get to look at those photos and, you know, say is this GBI, is this some serious injury.

"Now, if you look at Exhibit No. 18 you can probably look at this photograph and say that is not enough. This is a bump on the head, and although it shouldn't have happened, it is not a great injury. It is not something that is significant, more than minor or moderate harm. The same thing with the right eye, above the right eye, and even the scratch on the nose. Exhibit No. 16, once again you are the triers of fact, you get to make a decision whether that is GBI. I am not going to argue to you that scratch on the nose is GBI, we all receive scratches a number of different times, is that more than minor or moderate harm, you get to decide based on all the circumstances.

"But in addition to that scratch on the nose you get to see her eye, this is what the People are arguing are more than minor or moderate harm,

and you get to see that in number 12[4] as well. You get to look at this eye. This is not a black eye, this is an eye that there appears to be some damage to the eye based on what you see in this photograph. You look at this, this is red inside. The eye itself it appears to be bleeding inside the eye, but you are the jury, you get to take a look at these photographs, both photographs 15 and 16 and you get to make a determination based on what the jury instruction tells you as it relates to what constitutes GBI. The People would argue to you that this is in fact GBI, this is more than minor harm. This is not a scratch on the nose, this is not a minor bump on the forehead. This is a situation where she has been struck in the eye with enough force to cause fairly serious injury to that eye, which is illustrated in the photographs."

The jury was instructed pursuant to CALCRIM No. 3163, the trial court stating:

"If you find [appellant] guilty of the crime charged in Count 1, inflicting injury on a spouse resulting in a traumatic condition you must decide whether the People have proved the additional allegation that [appellant] personally inflicted great bodily injury on Kim Cole during the commission of that crime, and under circumstances involving domestic violence.

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"Domestic violence means abuse committed against an adult who is a spouse or person with whom [appellant] has had a child. Abuse means intentionally or recklessly causing or attempting to cause bodily injury or placing another in reasonable fear of immediate serious bodily injury to himself or herself or to someone else. Committing the crime of violation of … Section 273.5, inflicting injury on a spouse resulting in a traumatic condition is not by itself the infliction of great bodily injury. The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden you must find the allegation has not been proved."

Viewing this evidence in the light most favorable to the judgment, and according due deference to the factual findings of the jury, we find the evidence was sufficient to support the jury's finding of great bodily injury.

---

[4]People's exhibit No. 12 depicts the exterior of the Cole residence; it does not depict any injury to Kim.

15.

It is logical to infer that blood pooled in the white or sclera of the eye represents a significant or substantial injury was incurred. Multiple contusions, swelling and discolorations on parts of a child's body were enough to satisfy the definition of great bodily injury in *People v. Jaramillo*, *supra*, 98 Cal.App.3d at page 837. In *Jaramillo*, after a bench trial, the court found the defendant guilty of felony child abuse and found true a great bodily injury enhancement. On appeal, the defendant claimed the great bodily injury enhancement had been improperly imposed because great bodily injury was an element of her child abuse conviction. As stated in *Jaramillo*, "while the issue might be close it appears that there were sufficient facts upon which the court could base its finding of great bodily injury and such a finding therefore will not be disturbed on appeal." (*Id*. at p. 836.) Like *Jaramillo*, here there are sufficient facts upon which the jury could base its finding of great bodily injury. The photographs of Kim show bright red blood present in the majority of the white portion of her left eye. The jury also heard, as we have, a woman screaming in pain in the 911 recordings.

Further, an injury need not be one that caused the victim to suffer permanent, prolonged or protracted disfigurement, impairment, or loss of bodily function. (*People v. Escobar*, *supra*, 3 Cal.4th at p. 750 [great bodily injury found where rape victim suffered extensive bruises and abrasions on legs, knees and elbows, injury to neck, and soreness in vaginal area impairing ability to walk]; *People v. Cross* (2008) 45 Cal.4th 58, 64 [injury "need not be so grave" as to cause victim permanent, prolonged, or protracted bodily damage]; see also *People v. Sanchez* (1982) 131 Cal.App.3d 718, 733 [multiple abrasions, lacerations, swelling and bruising to eye and cheek]; *People v. Corona* (1989) 213 Cal.App.3d 589, 592-595 [great bodily injury finding sustained where victim suffered swollen jaw, bruises to head and neck, and sore ribs].) Thus, appellant's assertions that because Kim did not seek medical attention for her injury, or that her ability to maintain normal activities was not impaired in any way, are not persuasive. A jury can, and did, find Kim's injury to involve great bodily injury and that injury need not be permanent, prolonged, or protracted.

Following our review of the photographic evidence, the audio recordings, and Sergeant Bietz's testimony, we find this evidence sufficient to allow a jury to conclude that Kim suffered great bodily injury within the meaning of section 12022.7.

## III.   The Evidence Pertaining to Appellant's Convictions for Dissuading a Witness Is Sufficient

Appellant argues the evidence pertaining to his convictions for dissuading a witness, his wife Kim, are legally insufficient.  More particularly, he argues that his words and actions evidence he did not violate the statute.  We do not agree.

As outlined more fully above, an appellate court's task in assessing a claim for sufficiency of the evidence is limited.  The court reviews the record in the light most favorable to the judgment to determine whether it contains substantial evidence and gives deference to factual findings made by the trier of fact.  (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 11; *Jackson v. Virginia*, *supra*, 443 U.S. at pp. 317-320.)

Section 136.1, subdivision (a)(2) provides:

> "(a) Except as provided in subdivision (c), any person who does any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison:  [¶] … [¶]

> "(2) Knowingly and maliciously attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law."

Section 136.1 punishes a defendant's "efforts to prevent a victim or witness from appearing in court and giving testimony."  (*People v. Fernandez* (2003) 106 Cal.App.4th 943, 948.)  It "requires proof that the defendant specifically intended to dissuade a witness from testifying."  (*People v. Young* (2005) 34 Cal.4th 1149, 1210.)  "'There is, of course, no talismanic requirement that a defendant must say "Don't testify" or words tantamount thereto, in order to'" violate section 136.1.  (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1344.)  As long as a defendant's words and actions support the reasonable inference that he or she attempted to induce a person to withhold testimony, a conviction of dissuading a witness is proper.  (*Ibid.*; see also *People v. Young*, *supra*, at p.

1210 [sufficient evidence of witness dissuasion found in "the combination of defendant's actions and words"].) And "[t]he intent with which a person acts is rarely susceptible of direct proof and usually must be inferred from facts and circumstances surrounding the offense. [Citations.]" (*People v. Massie* (2006) 142 Cal.App.4th 365, 371.)

The evidence pertaining to appellant's convictions in counts 8 through 12 consisted of recordings made of six[5] telephone conversations between appellant and Kim, and others, while he was incarcerated in the Kings County jail. Appellant interprets his words heard in these telephone calls as "giving advice on how to follow through with a course of action [Kim] had already decided to take as she did not appear in court," and that he was "merely telling [Kim] if she did not want to testify, she would have to go somewhere beyond the reach of a court subpoena." In examining the entire record, we have listened to the recordings that were played for the jury and we conclude the record contains substantial evidence from which a rational fact finder could reasonably determine that appellant knowingly and maliciously dissuaded Kim from testifying.

By way of example, in a call recorded December 18, 2008, appellant is heard telling Kim that if she does not show up to testify, the government would have no case and no reason to enter appellant's residence. In that same call, he tells her to "miss that subpoena" and that even if she were served, she could plead "the 5th I love my husband [it's] not true, he's not guilty." On December 19, 2008, he tells Kim: "but anyway the big thing is you can't show up," and "They're going to subpoena you they need you without you they don't have shit."

In a third call, made December 22, 2008, appellant tells Kim "[y]ou do not answer the door, you stay away from there. This is where we're fucked man" and "if they subpoena I'm going to get fucked okay  [¶] … [¶] … so you need to avoid that at all costs." He tells Kim that she may "have to take flight," and "you will come visit me and

[5]A total of six telephone calls were made during this time period. However, only five of those calls resulted in charges. The call made December 23, 2008, did not result in any charge pursuant to section 136.1.

18.

we will discuss the Priscilla deal." Later, appellant asked Kim, "[W]hat did you tell the officers? Did they take pictures of you?" Then, after Kim advises appellant she told the truth, he said, "That's it you fucked up I'm through unless you're going to sit there in court and say this chick Priscilla come to the door, she bombed on you ran over there next door to Gina." Appellant plainly lays out the story regarding Priscilla to Kim: "At that point just say this Priscilla chick came knocked on the door, said your old man, woo, woo, woo and bombed on you," "So you were assuming that I was having an affair with her you start arguing with me this bitch bombed on you. See what I'm saying," "So I never laid a hand on you, this bitch Priscilla did that's the bottom line if they subpoena you," and "The only thing you can do is say no he didn't hit me." Further discussion is had during the December 22d call about how Kim should avoid service of process.

In the December 23, 2008, recording, appellant asks Kim about going to Salinas. On December 24th, Kim tells appellant she is not planning to leave or move and he replies, "Why they're going to serve you, they're going to get a hold of you [¶] … [¶] … you got to stay PC'd up and not go out nowhere." Later during the call, appellant speaks with one of his sons and directs him to help Kim "because they're going to try and serve her papers and she doesn't want to be served no papers okay because it will hurt me." He further advises his son that if any law enforcement officer asks about Kim, his son should tell the officer that Kim went to Salinas. Speaking with Kim again, appellant tells her "the minute you get subpoenaed it don't matter if you leave or not I'm fucked, I'm fucked, pretty well fucked."

On December 26, 2008, appellant advised Kim he was concerned with her safety because with her "out of the picture they can use anything you said and make up anything that you didn't say against me and they got pictures already." He wanted Kim to meet with him at the jail "to go over our game plan," and indicated if the case were to go to trial "me and you will have several visits and get this shit together …." During this conversation, Kim handed the phone over to appellant's mother. Appellant told his mother that "Kim is the biggest key if she won't help them they got nothing." Speaking

19.

once again with Kim, appellant stated, "You're the one that's going to help me. You're it, you're the one I can't let get away, you understand because you are on my side," and "The bottom line is I did not touch you. [¶] … [¶] You got to stick to that and you got to tell them about Priscilla." Later, appellant stated "And I need you very much by my side on this. I may go to superior court with people, you may have to take the stand *and tell what I said*. You may have to say what's been said." (Italics added.)

Appellant's words and actions support the reasonable inference that he attempted to induce Kim to withhold her testimony. We are not persuaded by his assertions that his words and conduct are merely advisory and responsive to her decision not to testify. For the foregoing reasons, we reject appellant's challenge to the sufficiency of this evidence.

## IV. The Trial Court Properly Sentenced Appellant to Consecutive Sentences in Counts 9 through 12

Appellant maintains section 654 barred imposition of consecutive eight-month terms on counts 9 through 12. Respondent argues the consecutive terms imposed on counts 9 through 11 were proper, but concedes the sentence imposed in count 12 should be stayed. We find the sentence imposed by the trial court was proper.

Section 654, subdivision (a) provides as follows:

> "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution of the same act or omission under any other."

The statute "precludes multiple punishment for a single act or omission, or an indivisible course of conduct. [Citations.]" (*People v. Deloza* (1998) 18 Cal.4th 585, 591.) If a defendant is convicted under two statutes for one act or indivisible course of conduct, section 654 requires that the sentence for one conviction be imposed, and the other imposed and then stayed. (*Deloza*, at pp. 591–592.) "Section 654 does not allow any multiple punishment, including either concurrent or consecutive sentences. [Citation.]" (*Id*. at p. 592.) The correct procedure is to impose a sentence for each count and

20.

enhancement and then to stay execution of sentence as necessary to comply with section 654. (*People v. Duff* (2010) 50 Cal.4th 787, 795-796.) The statute serves the purpose of preventing punishment that is not commensurate with a defendant's criminal liability. (*People v. Hall* (2000) 83 Cal.App.4th 1084, 1088.)

"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19; see *People v. Hairston* (2009) 174 Cal.App.4th 231, 240.)

> "If [a defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639; see also *People v. Britt* (2004) 32 Cal.4th 944, 951-952.)

The language of section 136.1 focuses on an unlawful goal or effect, the prevention of testimony, rather than on any particular action taken to produce that end. "Prevent" and "dissuade" denote conduct which can occur over a period of time as well as instantaneously. The gravamen of the offense is the cumulative outcome of any number of acts, any one of which alone might not be criminal. (*People v. Salvato* (1991) 234 Cal.App.3d 872, 883.)

Here, appellant maintains that the telephone calls made between December 18 and December 26—despite being made on five different occasions—constitute one indivisible intent to dissuade Kim from testifying.**6**

Defense counsel did not address the issue during his presentation to the trial court before it imposed its sentence. Thereafter, the trial court stated: "Counts 8 through 12 are all for violations of … Section 136.1(a)(2). The Court will impose a consecutive

---

**6**See footnote 5, *ante*.

21.

sentence of one-third the midterm for each count." By ordering consecutive terms and failing to stay any term, the court impliedly found that appellant had a separate intent and objective for each offense pertaining to counts 8 through 12.

A review of the calls made by appellant from the jail to his wife at home reveals there is sufficient evidence of separate intents and objectives for the offenses committed in counts 8 through 12. In the first call, appellant tells Kim that without her testimony the government would have no case and thus she should "miss that subpoena" and avoid service. The following day, appellant tells Kim not to show up in court because without a subpoena the government cannot force her testimony. In the third call, appellant tells Kim that she needs to avoid service of a subpoena at all costs, she may "have to take flight," and that she needs to visit him in jail so that they can "discuss the Priscilla deal." In the fourth call, made December 23, 2008, appellant says, "Listen they're going to be going like to Salinas right?" On December 24, 2008, further discussion occurs regarding Kim's need to avoid being served with a subpoena and the fact that, if asked, law enforcement should be advised that Kim went to Salinas. In a final call, made December 26, 2008, appellant advises Kim that she needs to visit him at the jail so that the two can discuss the "game plan" or Priscilla story and that if the case were to go to trial, they would need to meet several times to get their "shit together." He tells Kim she may have to testify about "what's been said."

In sum, we find appellant intended the following objectives: (1) to dissuade Kim from testifying in court; (2) to convince Kim to avoid service of a subpoena that would require her testimony; (3) to persuade Kim to leave the area and go to Salinas; and (4) to dissuade Kim from testifying truthfully about what occurred between them on December 11, 2008.

Even if we assume for the sake of argument that appellant's phone calls to Kim from jail were made with a "single generalized intent and objective …, separate sentencing was still permissible." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) As the *Gaio* court explained, "[u]nder section 654, 'a course of conduct divisible in time,

although directed to one objective, may give rise to multiple violations and punishment. [Citations.]' [Citations.] This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken. [Citation.]" (*People v. Gaio*, *supra*, at p. 935.)

Appellant's numerous calls were divisible in time and temporally separated, permitting him the opportunity to "reflect and to renew" his intent before making the next telephone call. The calls were not incidental to one another, but completely independent. To the extent respondent contends the phone call relating to count 12 should be stayed as it involved the same objective as that in count 9, we do not agree. As explained in *People v. Gaio*, even where the objective is the same, because the conduct is divisible in time, multiple violations and punishment are permissible.

The sentence imposed here is proper.

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
WISEMAN, Acting P.J.


_____
KANE, J.

23.